## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**TRACEY A. BROCKMANN**                                    **CIVIL ACTION**

**VERSUS**                                                 **NO. 06-10896**

**MICHAEL J. ASTRUE,**                                     **SECTION "C"(3)**
**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION**

# REPORT AND RECOMMENDATION

Plaintiff, Tracey Anne Brockmann ("Brockmann"), seeks judicial review pursuant to

Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner

of the Social Security Administration (the "Commissioner"), determining that Brockmann was

not disabled and denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI").   The Court has jurisdiction pursuant to 42 U.S.C. §405(g)

and the matter has been referred to the undersigned Magistrate Judge for findings and

recommendations.

Currently before the Court are the plaintiff's brief in support of her appeal of the

Commissioner's decision and the Commissioner's motion for summary judgment seeking

dismissal of the plaintiff's case with prejudice.   Having reviewed the parties' written

submissions, the entire administrative record and the applicable law, the undersigned Magistrate

Judge finds that the Commissioner failed to address new and material evidence, *inter alia*, and

therefore RECOMMENDS that the Commissioner's Motion for Summary Judgment be

DENIED, the Commissioner's decision be REVERSED and that this case be REMANDED for

further proceedings consistent with this report.

## I. PROCEEDINGS

On September 29, 2003, the plaintiff filed applications for disability insurance and

supplemental security income benefits.[1] Plaintiff claimed inability to work as of August 1, 2003

due to "back surgeries and right leg trauma.[2]   The Commissioner initially denied the plaintiff's

application for benefits,[3] finding her discogenic/degenerative disorders of the back not disabling

within the meaning to the Act.  The Commissioner explained :

> You said that you became disabled on 8/01/2003 because of back
> and leg problems.  The medical evidence shows that your
> condition imposes some limitations but it does not render you
> totally disabled.  We have concluded that you can perform your
> past relevant work as a medical biller, as it is usually performed
> across the country.  We have determined that your condition is not
> severe enough to keep you form working.  We considered the
> medical and other information, your age, education, training and
> work experience in determining how your condition affects your
> ability to work.[4]

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[5]

_____

[1]*See* Application for Disability Insurance Benefits [Adm. Rec. 43-46]; Application for
Supplemental Security Income [Adm. Rec. 201-204].

[2]*See* Disability Report dated December 8, 2003 [Adm. Rec. 49].

[3]*See* Disability Determination and Transmittals dated April 30, 2004 [Adm. Rec. 24-30, 205].

[4]*Id.* [Adm. Rec. 27].  *See also* Report of Contact dated April 14, 2004 [Adm. Rec. 74].

[5]*See* Request for Hearing dated June 18, 2004 (disagreeing with the determination claiming
that she could not work as a medical biller because she cannot sit for long periods of time, she has

An administrative evidentiary hearing was conducted in Baton Rouge, Louisiana on January 24, 2006 by ALJ Demos Kuchulis.  Plaintiff was accompanied at the hearing by a non-attorney representative, Dana Matthews.[6]  Pursuant to the hearing and his review of Brockmann's medical records, ALJ Kuchulis denied Brockmann's claims.[7]  Plaintiff requested review by the Appeals Council which was denied.[8]

On December 13, 2006, Brockmann filed the captioned matter seeking review of the Commissioner's determination and the case is now ripe for determination.

## II. JUDICIAL REVIEW

### A. "Substantial Evidence" Standard

The function of the court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal

_____

a hard time staying focused and concentrating and that her impairments prevent her from engaging in any substantial gainful employment) [Adm. Rec. 31].

[6]*See* Transcript of January 24, 2006 Hearing [Adm. Rec. 256]; *See* Correspondence of "Dana Matthews Representative/Non-Attorney" [Adm. Rec. 195-198].

[7]*See* ALJ Kuchulis' Decision dated March 28, 2006  (finding that (1) Brockmann's status post remote low back surgery, lumbar degenerative changes, depression and obesity, whether considered singly or in combination while "severe" within the meaning of the Act, did not meet or medically equal on the impairments listed in Appendix 1, Subpart P, Regulation No. 4, (2) her allegations regarding her limitations were not totally credible and (3) Brockmann's past relevant work as a medical biller, referral coordinator and secretary did not require the performance of work-related activities precluded by her residual functional capacity to perform sedentary work).

[8]*See* Request for Review of Hearing Decision dated May 30, 2006 [Adm. Rec. 8]; Notice of Appeal's Council's Action dated October 19, 2006 (which did not mention that the Appeals Council received or reviewed counsel's letter brief enclosing new and material evidence) [Adm. Rec. 5-7]; Letter Brief submitted by Monica Ferraro, Esq. on behalf of Brockmann dated August 30, 2006 (enclosing new medical reports/clinical findings which were not reviewed by the ALJ) [Adm. Rec. 206-253].

standards in evaluating the evidence.[9]  If the Commissioner's findings are supported by

substantial evidence, they must be affirmed.[10]

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to

accept as adequate to support a conclusion.[11]  It is more than a scintilla, but may be less than a

preponderance.  *Id*.  A district court may not try the issues *de novo*, reweigh the evidence, or

substitute its own judgment for that of the Commissioner.[12]   However, the district court must

scrutinize the record in its entirety to determine the reasonableness of the decision reached and

whether substantial evidence exists to support it.[13]  Any of the Commissioner's findings of fact

which are supported by substantial evidence are conclusive, regardless of whether other

conclusions are also permissible.[14]

### B. Eligibility for Disability Benefits

To qualify for Social Security income or disability insurance benefits, the plaintiff must

meet the requirements set forth in the Social Security Act.[15]  Specifically, the plaintiff must be

---

[9]*See* 42 U.S.C. § 405(g); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993); *Carriere v. Sullivan,* 944 F.2d 243, 245 (5th Cir. 1991).

[10]*Martinez*, 64 F.3d at 173.

[11]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); and *Spellman*, 1 F.3d at 360.

[12]*Ripley*, 67 F.3d at 555; *Spellman,* 1 F.3d at 360 .

[13]*Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

[14]*Ripley,* 67 F.3d at 555; *see also Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

[15]*See* 42 U.S.C. § 423(a).

under age 65, file an application for benefits and be under a disability as defined by the Act.[16]

Those claiming disability insurance benefits under the Act have the burden of showing the

existence of disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which ...

has lasted or can be expected to last for a continuous period of not less than 12 months."[17]

Establishment of "disability" within the meaning of the Act is twofold.  First, the claimant must

demonstrate that she suffers from a medically determinable impairment. Second, the claimant

must prove that her impairment or combination of impairments render her unable to engage

either in the work she previously performed or other substantial gainful employment that exists

in the national economy.[18]

The regulations include a five-step evaluation process for determining whether an

impairment prevents a person from engaging in any substantial gainful activity.[19]  The five-step

analysis was cogently restated in *Shave v. Apfel*, 238 F.3d 592 (5th Cir. 2001):

> First, the claimant must not be presently working at any  substantial gainful
> activity. Second,  the claimant must have an impairment or combination of
> impairments that are severe.  An impairment or combination of impairments is
> "severe" if it "significantly limits [a claimant's] physical or mental ability to do
> basic work activities."  Third, the claimant's impairment must meet or equal an
> impairment listed in the appendix to the regulations.  Fourth, the impairment must
> prevent the claimant from returning to his past relevant work.  Fifth, the
> impairment must prevent the claimant doing any relevant work, considering the
> claimant's residual functional capacity, age, education, and past work experience.
> At steps one through four, the burden of proof rests upon the claimant to show he

---

[16] *See* 42 U.S.C. §§ 416(I), 423(a).

[17] *Id.* at  § 423(d)(1)(A).

[18] *Id.* at §§ 416(I)(1), 423(d)(2).

[19]  *Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir. 2000).

is disabled.  If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.[20]

The Court weighs four elements of proof in determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."[21]

### C. Standards Applicable to Medical Evidence

The ALJ must follow the Guidelines set forth in 96-2p to determine whether "controlling weight" should be given medical opinions of a "treating source."  These guidelines are that: (1) the opinion must come from a "treating source;" (2) the opinion must be a "medical opinion;" (3) the treating source's medical opinion must be "well supported" by "medically acceptable" clinical and laboratory techniques; and (4) even if supported, the opinion must not be inconsistent with other substantial evidence.  Even if the ALJ finds that the treating source's medical opinion is not entitled to controlling weight, that does not mean that the opinion can be rejected.  "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927."[22]

The factors provided in 20 C.F.R. 404.1527 and 416.927 include: (1) Examining

---

[20]*Shave*, 238 F.3d at 593.

[21]*Newton v. Apfel,* 209 F.3d at 452 (*citing Brown v. Apfel*, 192 F.3d 492, 296 (5th Cir. 1999)); *Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir. 1995).

[22]SSR 92-2p.

6

relationship; (2) Treatment relationship, length of treatment, frequency of examination, nature and extent of relationship; (3) Supportability; (4) Consistency; and (5) Specialization.   "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."[23] Medical opinions of a specialist are generally accorded more weight than opinions of a source not a specialist.[24]   However, specialization is only one of several factors considered in the evaluation of medical opinions.  In summary, the Commissioner has considerable discretion in assigning weight to medical opinions and is free to reject the opinion of any physician when substantial evidence supports a contrary conclusion.[25]

### III. FACTUAL BACKGROUND

#### A. Administrative Hearings

Born on March 29, 1966, plaintiff was 36 years old at the time of the hearing.[26] Brockmann testified that she completed the twelfth grade and then attended several colleges in Mississippi, including Virginia College, Beth Davis Community College and East College Vocational.  She received a Secretary of Science and a certification in Medical Assistance (i.e.,

---

[23]*Shave v. Apfel,* 238 F.3d 592, 595 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).

[24]*Moore*  v. *Sullivan,* 919 F.2d 901, 904 (5th Cir. 1990).

[25]*Greenspan*, 38 F.3d at 237; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Spellman*, 1 F.3d at 364; *Moore v. Sullivan,* 919 F.2d at 905.

[26]Transcript of Hearing [Adm. Rec. 258].

medical billing records).[27]  Brockmann testified that she had two children but one is deceased and the other is in the custody of her ex-husband in Ohio.  At the time of the hearing, plaintiff resided with her third husband, who has joint/shared custody of his two teenage children.[28]

Plaintiff testified that she pays $152.48 a month child support for her thirteen year old child, who lives in Ohio with her ex-husband.  However, Brockmann stated that her child support payments are in arrears because she cannot work.  Plaintiff explained that her ex-husband got custody of the minor in 1997, when she had back surgery and could not take care of the minor child, who was 4 years old at the time.[29]

Plaintiff testified that she has not driven in two and a half years.  Her prescription medications include: (1) Zoloft, Trazodone, and Valium (psychotropic drugs); and  (2) Zanaflex (for nerve convulsions in her right leg and right arm).  Brockmann stated that she suffers on a daily basis with side-effects of extreme dry mouth, nausea, diarrhea and dizziness.  When the ALJ suggested that the side-effects she described seem to outweigh the therapeutic need for the medications, plaintiff testified that she has thoughts of suicide when she is not taking the prescribed medications.  When asked if she had ever tried suicide, Brockmann decompensated and began to cry for the second time during the administrative hearing.  When the ALJ indicated that he may have to continue the hearing to a later date, Brockmann recomposed herself and proceeded to answer the ALJ's interrogation about her self-destructive thoughts. Plaintiff testified that she had self-destructive thoughts on three occasions and that she tried to commit

---

[27]*Id.* at 258-59.

[28]*Id.* at 259-60.

[29]*Id.* at 261-62.

suicide in February of 2006 by starving herself.  Brockmann stated that she sees her psychiatrist once every three months.[30]

As to her physical condition, plaintiff appeared at the hearing in a wheelchair which she indicated was prescribed by a doctor at Charity.  The ALJ called for the documentation indicating that she was prescribed a wheelchair.  Plaintiff testified that she has prescriptions for a neck brace and back brace also and indicated that she would provide the ALJ with copies of those prescriptions.[31]

Turning to her daily activities, Brockmann testified that she does not eat breakfast and usually stays in bed several hours every morning.  If there is no sandwich by her bed, she gets up around noon for lunch and then she tries to read, crochet or watch television until she falls asleep.  Brockmann testified that when the family gets home at 5:30 P.M., her husband helps her out of bed and she eats dinner either on the sofa in the living room or back in her bed.  She further testified that, because of her back problems and pain from the related nerve damage in her right leg, she cannot perform any household chores and can only sit for about 15 minutes at a time.  Plaintiff indicated that she cannot walk without assistance and cannot lift at all ("zero").[32]

As to her former employment, plaintiff testified she worked for approximately four months in 2001 for a home health care agency taking care of the elderly but had to stop when the work load increased and she had to lift patients.  She also worked as a baker's assistant for about four months but could not perform the job on her own because of the standing requirement and

--------

[30]*Id.* at. 263-65.

[31]*Id*. at 265-66.

[32]*Id*. at 266-69.

because she could not concentrate enough to follow the recipe directions.  From August of 1999 to February of 2000, Brockmann worked as a medical biller.  Prior to that, she worked as a medical coordinator.  Plaintiff testified that from 1988 to 1997 she was the personal secretary for Mr. Adler and that her work included appraisals, letters and transcriptions.[33]

Brockmann testified that she has been battling with her weight and major depression since her daughter died.  Plaintiff indicated that she was first diagnosed with depression when she was 19 years old.  Brockman stated that it was then that she realized that her mother had tried to kill her three times and that she has been dealing with depression since that time.[34]

Considering Brockman's age, education, experience, residual functional capacity and limitations ascribed by ALJ Kuchulis, VE Karen Harrison opined that plaintiff could perform her past relevant work as a medical biller, referral coordinator and secretary.  The VE's opinion was based upon the assumption that Brockmann could lift 20 pounds occasionally and ten pounds frequently, that she could stand or walk for less than two hours in an eight hour day and that she could sit with normal breaks for the remaining six hours.  The VE's opinion recognized restrictions from climbing stairs, ladder and scaffolds.  Additionally, VE Harrison assumed that the plaintiff was capable of performing simple repetitive work.[35]

The VE further testified that, if Brockmann was unable to sit for more than fifteen minutes, unable to stand or walk for any appreciable amount of time and could not lift any weight at all, she could not perform her past relevant work or any other employment on a

---

[33]*Id.* at 269-72.

[34]*Id.* at 273

[35]*Id.* at 275-76.

sustained basis.[36]

## B.  Medical History

Plaintiff takes issue with the ALJ's characterization of the medical record.  Plaintiff alleges that the ALJ erred in that he selectively discussed her medical history, favoring the treatment records prior to 2004, giving great weight to the consultative examiner's report dated April 1, 2004 and ignoring the steady course of psychiatric treatment evidenced by her mental health treatment records as well as the significant course of psychotropic and pain medications prescribed regularly throughout the relevant period and their effect on her ability to work.

Based upon a selective review of the medical records the ALJ arrived at the following conclusions, to wit:

Claimant presents little longitudinal history of treatment by mental health professionals.  Moreover, claimant's general treatment records do not provide specific credible findings which would support severe functional limitations. (Exhibit 1F).  Briefly in 2003, claimant and her husband had counseling for help with communication and step-parenting. (Exhibit 4F).  Beginning in April 2004, claimant received some counseling services and medication at River Parishes Medical Health Center. (Exhibit 7F).  Records generally reflect that claimant was experiencing some stress related to family relationship difficulties.  The fact claimant has not required more intensive treatment and/or hospitalization suggests that on medications claimant was not encountering undue mental stress.

At the second step of the sequential disability determination process (described supra) claimant has not met her burden of demonstrating the existence of a severe mental health impairment.  The record warrants the conclusion that claimant has not had a mental health impairment which has interfered with the performance of basic work-related activities (hence claimant's mental health impairment is not "severe").

Claimant alleges that she has been unable to work since August 1, 2003 when she injured her lower back.  Claimant states that she was not actually employed at this time and she gives several differing accounts of her alleged injury (Exhibit 2E).

---

[36]*Id.* at 276

In any case, it appears to be claimant's contention primarily that she is unable to work due to persistent back pain.

Claimant's history of spinal problems predates her alleged August 1, 2003 onset date by several years.  In an effort to understand the true extent of claimant's functional limitations, the undersigned has carefully considered claimant's history of low back surgery which includes a 1996 L5-S1 disc excision and a 1997 L5-S1 fusion. (Exhibit 5F).  It must be concluded that claimant did well post-operatively, because claimant returned to work and over the ensuing years and she apparently did not seek further treatment for low back pain.

About 6 years after her last surgery, on August 4, 2003, claimant sought emergent treatment for an acute onset of back pain after her child stepped on her shoe. (Exhibit 4F/6).  X-rays showed post-operative and degenerative changes, but no acute bony abnormality.  (Exhibit 4F/8).

Claimant was followed intermittently at Leonard J. Chabert Medical Center through October 23, 2003 for complaints of back pain.  (Exhibit 3F).  Medications were prescribed, but it does not appear that she received much in the way of definitive treatment.  The October 23, 2003 examination revealed that claimant was ambulating with a normal gait and that she was neurologically intact. (Exhibit 3F/5).  The diagnosis was simply low back pain.

Although claimant alleges that she continues to be disabled, she has really not sought treatment on a continuing basis.  The record does include an April 1, 2004 consultative examination performed at the request of DDS.  (Exhibit 5F).  The results of this consultative examination support the conclusion that claimant is able to work.

Not only have clinical findings been rather limited, but diagnostic studies also fail to provide much support for the claimant's allegation of disabling functional limitations and pain.  As noted, supra, August 2003 lumbar spine x-rays demonstrated no abnormalities of recent origin.  (Exhibit 4F).  No abnormalities of recent origin were noted on repeat August 29, 2003 x-rays.  (Exhibit 2F/4).  A September 19, 2003, lumbar MRI demonstrated degenerative and post-operative changes, but was negative for disc herniation.

On April 1, 2004, claimant advised DDS Consultant Camalyn W. Gaines, M.D., that she had no recent follow-up treatment by means of physical therapy or back injections. (Exhibit 5F).  Although she had no continuing treatment, she alleged radiating low back pain.  Although claimant presented to her on January 24, 2006 hearing in a wheelchair, claimant told Dr. Gaines that she could walk a half of a block without difficulty. Upon examination [on April 1, 2004], claimant had some limitation of range of cervical motion and lumbar motion.  Claimant had

subjective tenderness to palpation, but no objective muscle spasms.  Claimant was
essentially neurologically intact, with 5/5 strength in her upper and lower
extremities, bilaterally.  Sensation was decreased in her right extremity, but not in
any particular anatomic distribution.  A functional overlay was evidenced by 13
out of 16 non-organic illness behavior signs.

With respect to residual functional capacity, Dr. Gaines opined that claimant
should be able to perform sedentary work lifting 20 to 25 pounds without
difficulty.

In short, the evidence establishes that in August 2003 claimant sustained what
appears to be a relatively minor back injury.  Examination on multiple occasions
was not particularly remarkable.  What sparing treatment she received was limited
to conservative modalities and there is no notation that surgical intervention was
ever recommended.  It would appear reasonable to conclude, therefore, that
despite some continued back pain, claimant has not experienced a disabling
degree of symptomatology.

* * *

The medical records show that claimant's exertional functional limitations are no
more than moderate and not disabling, and that she has no mental impairment
which has resulted in severe functional limitation.

The credible medical opinions and notes throughout the record weigh heavily
against claimant's allegations of disability.  The allegations of symptom levels
that preclude all types of work are not consistent with the evidence as a whole and
are not credible.  None of the physicians involved in claimant's evaluation have
provided objective findings which would indicate that claimant was disabled....

* * *

Although claimant may admit to few activities of daily living, the record does not
reflect that this is other than on a voluntary as a opposed to a medical basis.
There is nothing in the record to support claimant's testimony that she must lay
down during the day for pain relief.  There is no medical evidence of such a
complaint to physicians, bed sores, muscle weakness or wasting, weight gain or
weight loss, or any other such evidence that she routinely requires bed rest during
a typical day.[37]

This Court's review of plaintiff's records from Medical Center of Louisiana (New

Orleans) dated August 29, 2003 note that she presented with complaints of progressive

worsening of her chronic lower back condition, including radiating pain in her right lower

---

[37]*See* ALJ Kuchulis's March 18, 2006 Decision [Adm. Rec. 17-18].

13

extremity to her foot.  Plaintiff was taking prescription medications Neurontin, Vicoprofin, Zoloft and Soma.  Her deep tendon reflexes were 3+ in her lower extremities bilaterally.  Plaintiff's motor strength ranged from 2/5 to 4/5 in the lower extremities.  There was decreased sensation in the right lateral lower leg and right lateral foot and weakness in her right leg.  Radiology reports indicated degenerative changes most pronounced at L5-S1.  The findings upon radiological imaging were: (1) intervetebral disc space narrowing at L5-S1; (2) end plate sclerosis and anterior osteophytes noted throughout; (3) additional spondylosis throughout the lumbar spine; and (4) mild straightening of the normal lumbar lordosis.  The diagnosis was lower back pain with myleopathy and radiculopathy.[38]

On September 12, 2003, plaintiff appeared at Edgard Primary Care for follow-up appointment complaining of no mobility, lack of ability to care for herself and increasing depression.  Plaintiff was instructed to continue counseling, her prescription drug Zoloft was increased and she was prescribed Ultram for leg and back pain.  Brockmann was ordered to return in one month.[39]

MCLNO's MRI performed on September 19, 2003 showed straightening of the lumbar lordosis as well as multilevel degenerative spondylosis.  A Schmorl's node was present at T12-L1, a disc bulge prominent to the left of the midline and resulting anterior sac deformity was noted at L1-L2, a dorsal disc bulge focally more prominent to the right of the midline appeared at L2-L3, a broad based dorsal disc appeared at L4-5 with mildly increased T2 signal within the dorsal annulus consistent with annular degeneration plus posterior elements of  hypertrophic

---

[38] *See* MCLNO Records [Adm. Rec. 133, 135, 137 and 138].

[39] *See* Edgard Primary Care Provider's Assessment dated September 12, 2003 [Adm. Rec. 124].

changes which contributed to the moderate bilateral recess narrowing and mild bilateral neural foraminal narrowing.  The image of the L5-S1 level showed a postoperative diskectomy with the disc space nearly obliterated, a high T2 signal in the dorsal aspect of the disc as well as mild to moderate bilateral neural foramina narrowing.[40]  Physician's notes indicate that Brockmann was referred to Neurology and had an appointment at Leonard Chabert in Houma, Louisiana on October 23rd, 2003.[41]

On October 23, 2003, Brockmann attended her neurology referral at Chabert Medical Center, complaining of chronic severe back pain, problems sleeping and fatigue.  Plaintiff was continued on her current medication and given samples of Vioxx.[42]

Edgard Primary Care Center Nursing and Provider's Assessment dated December 10, 2003 show that plaintiff appeared for her follow up appointment regarding her depression, leg and back pain.  Physician's notes indicate that her medications (Vioxx, Neurontin, Ultram, Soma and Zoloft) were continued and Brockmann was referred to Neurology.  The provider's assessment dated January 12, 2004 indicates plaintiff presented with paresthesia (abnormal sensation) in her hip and sciatic pain which was worse on the right.  The physician noted that plaintiff was a depressed young woman with right-sided neurologic complaints following a long history of back problems.  The plan was to schedule a neurological evaluation as soon as possible and her Zoloft prescription was renewed. Other medications (Neurontin, Ultram and

---

[40]MCOLNO Department of Radiology Report dated September 19, 2003 [Adm. Rec. 128-29, 218].

[41]*Id.* at 128-29.

[42]Chabert Medical Center Records [Adm. Rec.140-41].

Soma) were not renewed pending the receipt of the neurologist's report.[43]

The February 3, 2004 report of Angela Centanne, DSW, a clinical social worker at St. John Clinical Counseling in LaPlace, Louisiana, noted that Brockmann initially requested help with communication and step-parenting but later reported severe depression.  With respect to the latter, the social worker indicated that plaintiff consistently attended individual counseling sessions between July and November of  2003.  Centanne observed that Brockmann had an extensive history of depression, abandonment, anxiety and a medical history that dictates severe limitations.  Centanne found that the plaintiff's painful medical condition and a number of environmental stressors contributed to her depression and anxiety.  Centanne observed that plaintiff ambulated with a cane, could sit for only short periods of time and that her physical and emotional pain were reflected in her posture, behavior, facial expressions and constant tearfulness. Centanne indicated that plaintiff did not pursue further counseling because she did not have a support system that would allow her to do so.[44]

Edgard Primary Care progress notes and assessment of February 17,  2004 indicate that plaintiff reported complaints of dizziness, pain, headaches, neck pain and right-sided soreness. Plaintiff was ordered to continue her physical therapy which was scheduled every Monday.[45]

On April 6, 2004, Dr. Camalyn Gaines noted that plaintiff's complaints included radiating pain in her right leg and numbness involving the entire right side of her body as well as

---

[43]*See* Edgard Primary Care Center Progress Notes and Provider's Assessments [Adm. Rec. 121-23].

[44]*See* Report of Clinical Social Worker signed February 3, 2004 [Adm. Rec. 153-54].

[45]*See* Edgard Primary Care Center Progress Notes and Provider's Assessments [Adm. Rec. 120].

weakness involving her right leg and hand.  Brockman further reported aggravation of her back pain with prolonged standing and sitting and that she gets some relief from lying down.  She further noted Brockmann's complaints of depression and "having bad nerves."[46]  At the time of her physical examination, Brockman stood 5'4" tall, weighed approximately 265 pounds (moderately obese) and exhibited apprehension throughout the exam.  Dr. Gaines further observed that plaintiff had a mild truncal list toward the left while standing and that she ambulated with an antalgic gait pattern on the right.  Plaintiff's neurological examination revealed 5/5 strength bilaterally in both upper and lower extremities and that her sensation was decreased to pin prick over the entire right upper and lower extremity, albeit in no particular anatomic distribution.

Dr. Gaines reviewed the September, 2003 MRI of plaintiff's lumbar spine, noting that it revealed evidence of post-surgical changes as well as mild compression of the right S1 nerve root and disc bulging at multiple levels.[47]  Dr. Gaines further noted that the overall trend of plaintiff's pain is worse over the past year.  Dr Gaines' diagnoses were cervicalgia and myofacial pain syndrome predominantly involving the right upper and lower extremity.  Nevertheless, the consulting examiner concluded that plaintiff retained the ability to lift 20 to 25 pounds without

---

[46]*See* Report of DDS Consultant Dr. Camalyn Gaines [Adm. Rec. 161-62].

[47]*See also* East Jefferson General Hospital's Post-Surgical MRI Report dated August 14, 1997 (noting a large *recurrent* disc herniation at the L5-S1 level lateralized mainly to the right side, degenerative facet joint disease changes seen at the same level which appear to encroach on the neural foramen and degenerative changes at the L1-L2 and L4-L5 levels with slight bulging) [Adm. Rec. 246].  *Compare*  Impression of MRI Report dated July 14, 1996 (noting the existence prior to surgery of a large broad based extruded disc herniation at the L5-S1 level, with the volume of herniated disc material considerably more prominent on the right of the mid-line and concluding that "this disc herniation could easily produce predominant symptomatology referable to the right S1 nerve root") [Adm. Rec. 252].

difficulty and perform a full range of sedentary work notwithstanding certain enumerated postural limitations and that "Brockmann would most likely be limited in any type of activities like standing and walking due to diffuse pain symptomatology."[48]

On May 4, 2004, plaintiff presented to River Parishes Mental Health Center complaining of decreased energy levels, depression and mood swings.  On May 21, 2004, Brockmann reported to her counseling session feeling physically or mentally unwell despite the fact that she was taking her medications as ordered.  On June 1, 2004, plaintiff attended her counseling session, noting a recent appointment at Charity's Neurology Clinic.  Brockmann reported that her energy level continued to be problematic due to the limitations caused by her back pain.  On June 18, 2004, plaintiff's Zoloft prescription was increased to help with her depression and Trazodone was continued to help her sleep.  Plaintiff reported that she continued to experience "a lot of pain, etc." attributable to her back condition.[49]   River Parishes' July 26th, 2004 Progress Notes state that plaintiff appeared very depressed and cried intermittently during the session.  In addition to the various environmental stressors, the counselor observed that Brockmann has "major issues dealing with pain ... due to her back problem."[50]  More frequent counseling sessions were recommended as part of the plan of her course of treatment.[51]

On September 7, 2004, plaintiff called River Parishes Mental Health to cancel her appointment on account of "too much pain" and mentioned that she had an appointment to see a

---

[48]*See* Report of DDS Consultant Dr. Camalyn Gaines [Adm. Rec. 163].

[49]*See* River Parishes Mental Health Center Progress Notes [Adm. Rec. 190-92].

[50]*Id.* at 188.

[51]*Id.*

18

neurosurgeon.  Outreach notes dated October 27, 2004 indicate that the plan was to continue her treatment with house visits since Brockman was in pain, unable to make the clinic follow up sessions and was in a wheelchair.   River Parishes Mental Health Center's Progress Notes indicate that plaintiff was treated on a regular monthly basis through December 23, 2005 *via* home health care calls and intermittent office visits.[52]  The records further reflect that Brockmann was wheelchair bound.[53]  In addition to recognizing that the plaintiff had major issues dealing with pain,[54] progress notes indicate the provider's concerns about "drug seeking behavior."[55]

The results of plaintiff's  March 8, 2005 cervical spine MRI results which were submitted to the Appeals Council for review showed the following findings:

> Findings:
> The cervical spine demonstrates straightening of the normal alignment, vertebral body height and marrow signal.
> At the C3/C4 level, there is right uncinate process hypertrophy and mild right neuroforamena narrowing;
> At C4/C5 level, there is posterior disc bulge, right uncinate process hypertrophy and mild right neuroforamena narrowing;

---

[52]*Id.* at 175-187.

[53]*Id.* at 175 (uses crutches and wheelchair to move),178 ("patient is wheelchair bound now"), 179 ("sitting in a wheelchair pushed by her husband"), 182 ("patient using crutches" because house under reconstruction and cannot accommodate a wheelchair), 183 ("assisted transportation of patient to doctor's appointment at clinic with wheelchair and neck brace"), 184 (uses hallway walls to push self and also noting that "there is an increase in using the wheelchair for her back pain and leg problems"), 186 ("in wheelchair" and "she is wheelchair bound"), 187 ("she is ... sitting in wheelchair",  "glad [she] has walls ... to push herself in her wheelchair" and "continues to be wheelchair bound ... to prevent falls [due to] pain and numbness") and 189 ("in wheelchair" and "numbness in foot").

[54]*Id.* at 188.

[55]*Id.* at 177 (noting that Brockmann is "still having drug seeking behavior and asking to ... double her dose").

At C5/C6 level, there is left uncinate process hypertrophy, mild bilateral articular facet hypertrophy and bilateral moderate neuroforamena narrowing.  Questionabe compression and contact of the nerve roots bilaterally and mild bilateral neuroforamena narrowing.

The visualized portions of the posterior fossa and spinal cord appear normal.
The paraspinal soft tissues are unremarkable.[56]

The March 8, 2005 results of the MRI of the plaintiff's lumbar spine stated:

The lumbar spine demonstrates straightening of the normal alignment, vertebral body height and marrow signal.

At the L1/L2 level, there is disc dessication, loss of disc height, left paracentral bulge, left neuroforamena narrowing and bilateral facet hypertrophy.

At the L2/L3 level, there is disc dessication, loss of disc height, posterior broad based disc bulge, bilateral facet hypertrophy, mild neuroforamena narrowing and mild spinal canal stenosis.

At the L3/L4 level, there is bilateral facet hypertrophy.

At the L4/L5 level, there is disc dessication, loss of disc height, posterior broad based disc bulge, moderate bilateral neuroforamena narrowing and bilateral facet hypertrophy.  Moderate to severe spinal canal stenosis with an AP diameter of 6mm.

At L5/S1 level, there [are] post-surgical changes, bilateral laminectomy, disc dessication, loss of disc height vs. diskectomy and enhancement around the nerve roots of S1 and possibly S2 ["suggested arachnoiditis vs. post-operative changes"].

The visualized portions of the spinal cord appear normal.
The paraspinal soft tissues and the retroperitoneal structures are unremarkable.
There is abnormal enhancement overlying the posterior soft tissues of the lower lumbar and sacrum spine secondary to post-operative changes.  Cystic formation is seen in the left kidney.[57]

A March 10, 2005 EMG study which was also submitted to the Appeals Council for review made the following finding:  "Acute and chronic radiculopathy with needle EMG findings largely limited to the right paraspinals."[58]

---

[56] *See* MCOLNO's MRI Report of the Cervical Spine dated March 8, 2005 [Adm. Rec. 220].

[57] *See* MCOLNO's MRI Report of the Lumbar  Spine dated March 8, 2005 [Adm. Rec. 224-25].

[58] *See* MCLNO-LSU Clinical Report dated March 10, 2005 [Adm. Rec. 217].

The May 3, 2006 diagnosis of Brockmann's mental health care provider made the following findings: (1) Axis I (Clinical Disorder) - Recurrent Major Depressive Disorder; (2) Axis II (Personality Disorder) - Deferred; (3) Axis III (General Medical Conditions) - Back Surgery, Neck Pain and Pinched Nerve; (4) Axis IV (Psychosocial and Environmental Stressors) - Family Conflicts, Multiple Deaths in the Family, Unemployed Due to Physical Pain (Limitation), Economic Problems, Health Care Services Not Available Locally, Child Support and Visitation Problems (Warrant) and Mother Sick (Cancer); and (5) Axis V (Global Assessment Functioning) - Score 50.  The action plan prescribed included individual and supportive counseling as needed, evaluation every three months or as ordered by Dr. Trinh, medication refill/monitoring and support therapy as ordered or on a monthly basis with nurses.[59] The multi-axial evaluation and report was submitted to the Appeals Council for review.

## IV.  CONTENTIONS OF THE PARTIES

Plaintiff makes the following arguments: (1) the ALJ erroneously failed to find plaintiff disabled as stated under Listing 1.04; (2) the ALJ's residual functional capacity assessment is not based upon substantial evidence; (3) the ALJ erred in failing to pose a complete hypothetical; and (4) the ALJ erroneously failed to fully develop the record and to consider all of the medical findings.   In addition, Brockmann argued that the ALJ selectively read the record, ignoring the great weight of the evidence and failed to discuss the full extent of the plaintiff's conditions. Plaintiff highlights that MRI's dated March 8, 2005 revealed even more severe underlying conditions than the earlier images.  Essentially, the plaintiff suggests that the ALJ only superficially reviewed the medical evidence and therefore his residual functional evaluation was

---

[59]*See* Multi-Axial Evaluation and Report Form dated May 3, 2006 [Adm. Rec. 230-31].

skewed and did not account for either the plaintiff's depression and its effect on her ability to

perform the requirements of a workplace setting or her severe pain which affected her reliability,

concentration, persistence and pace.  Brockmann, who was represented by a *non*-attorney at the

January 24, 2006 administrative hearing, was not permitted an opportunity to suggest that

limitations resulting from plaintiff's recurrent major depression disorder be included in a

hypothetical posed to the vocational rehabilitation expert.

The Government contends that substantial evidence supports the Commissioner's

decision and that "'none of the physicians involved in claimant's evaluation have provided

objective findings which would indicate that claimant was disabled nor have they provided any

credible statement or recommendation that she has been unable to perform substantial gainful

activity for a continuous period of at least 12 months.'"[60]  The Commissioner highlights the DDS

Consultative Examiner's report arguing it is entitled to substantial weight.  Defendant further

argues that the ALJ considered all of the relevant medical findings and opinions in the process of

assessing plaintiff's claim of disability.  The Commissioner submits that the ALJ fully and fairly

developed the record and that, in any event, the plaintiff has failed to demonstrate any prejudice.

Finally, the Commissioner submits that ALJ's credibility determination figured prominently in

the formulation of his first hypothetical question.  Defendant contends that the ALJ reasonably

relied on the VE's opinion that Brockmann was capable performing her past relevant work

because the hypothetical question reasonably incorporated all of the limitations credited by the

ALJ.

---

[60]*See* Commissioner's Memorandum in Support of Summary Judgment at p. 8 (quoting the ALJ's decision) [Fed. Rec. Doc. #15].

## V. ANALYSIS

### Listing 1.04

Plaintiff maintains that she meets the requirements of Listing 1.04.  Brockmann

complains that, due to the ALJ's superficial review of the medical evidence which contemplated

the April 1, 2004 findings of Dr. Camalyn Gaines and eclipsed prematurely at the point, the ALJ

committed legal error and his determination is not supported by substantial evidence.

Listing 1.04 governing disorders of the spine requires "compromise of a nerve root ... or

the spinal cord, with: (A) Evidence of nerve root compression ... or (B) Spinal arachnoiditis,

confirmed by an operative note or pathology report of tissue biopsy ... or (C) Lumbar spinal

stenosis resulting in pseudoclaudication established by findings on appropriate medically

acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in

inability to ambulate effectively, as defined in 1.00B2b."[61]

Listing 1.00B2b(2 ) provides:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. *Individuals must have the ability to travel without companion assistance to and from a place of employment....* **Examples of ineffective ambulation include** ... the inability to walk without the use of a walker, two crutches or two canes, *the inability to walk a block at a reasonable pace on rough or uneven surfaces*, *the inability to use standard public transportation*, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.... *Id.* (emphasis added).

Whether the ALJ determined that the plaintiff did not meet the prerequisites necessary for

a finding of disability under Listing 1.04 (A), (B) or ( C ) is not apparent from this Court's

---

[61]20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A)-(C).

review of the record.  The ALJ did not discuss any of the Listing 1.04 requirements *vis a vis*
Brockman's medical evidence and his review of her medical records does not appear to have
gone beyond Dr. Camalyn Gaines' April 1, 2004 report.   The ALJ's discussion did not
contemplate March 8, 2005 MCOLNO Reports of Findings regarding Cervical and Lumbar
MRI's performed on the plaintiff or the March 10, 2005 EMG study. [Adm. Rec. 217, 220-21,
224-25].[62]   The ALJ concluded that the plaintiff ambulated effectively without addressing the
myriad of treatment notes referencing the fact that plaintiff was wheelchair bound, required
home health care and/or was dependent upon others for special assistance with transportation.[63]
At the very least, plaintiff's medical history, including plaintiff's MCOLNO records and River
Parishes Mental Health Center Records, indicate that, at some point in her treatment,
Brockmann's back and leg pain obliged her to use crutches or a wheelchair.

  Regarding the plaintiff's purported inability to ambulate effectively, reference should be
made to Listing 1.00B2b.  That regulation provides that the inability to ambulate effectively also
includes "the inability to walk a block at a reasonable pace on rough or uneven surfaces."  20
C.F.R. Appendix 1 § 1.00B2b(2 ).  The ALJ did not discuss any of the examples of "ineffective
ambulation" set forth in the Regulations.  The ALJ did not address plaintiff's purported inability
to travel without companion assistance or mention the numerous notations in plaintiff's medical
records which suggest that this was the case.

  The ALJ committed legal error by failing to follow the regulations in the following
respects, to wit: (1) selectively reviewing the plaintiff's medical evidence as noted herein above,

---

[62]*See* Notes 55-57, *supra*, and accompanying text.

[63]*See* Note 52, *supra*, and accompanying text.

(2) failing to specifically address listing 1.04's requirements in light of the *all* of the objective clinical/medical evidence presented; and (3) rejecting clinical findings and opinions of plaintiff's treating physicians without any explanation whatsoever.

### Residual Functional Capacity (RFC)

Social Security regulations and rulings provide guidance for the ALJ in determining a claimant's RFC.[64]   Specifically, the regulations provide that RFC is "an assessment based upon all of the relevant evidence."[65]   In addition, SSR 96-8p provides that the ALJ "must consider all allegations of physical and *mental* limitations or restrictions and make every reasonable effort to ensure the file contains sufficient evidence to assess the RFC."[66]   The RFC assessment must always consider and address *all* medical source opinions.   SSR 96-8p states that an ALJ's assessment of claimant's RFC must contain a "thorough discussion of the objective medical evidence," as well as discuss how, "any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[67]   Social Security Ruling 96-8p provides that residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis " means 8 hours a day, for 5 days a week, or an equivalent work schedule.   "The RFC assessment is a function-by- function assessment based upon all of the

---

[64] *See* 20 C.F.R. §§ 404.1545, § 416.945; and SSR 96-8p.

[65] 20 C.F.R.  § 404.1545(d).

[66] SSR 96-8p .

[67] *Id.*

relevant evidence of an individual's ability to do work-related activities."[68]  Therefore, inherent in every residual functional capacity assessment is a finding that the claimant can perform work on a regular and continuing basis, and thus can maintain employment.[69]  The Fifth Circuit considers these regulations and rulings to be relevant to any decision.[70]

The ALJ did not assess Brockmann's mental RFC as required by 20 C.F.R. § 404.1520a(d)(3).  20 C.F.R. § 404.1520a(d)(3) states that "[i]f [the ALJ] finds that [the claimant has] a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then assess [the claimant's] residual functional capacity."  Considering that section 404.1520a is titled "Evaluation of Mental Impairments," it is clear that subsection (d)(3) of that section is referring to the claimant's mental RFC.[71]

The ALJ gave the following assessment of Brockmann's RFC:

The claimant has the following residual functional capacity: lift and/or carry up to 20 lbs. occasionally and 10 lbs. frequently; occasionally climbing, stooping, kneeling, crouching and crawling; stand/walk 2 out of 8 hours; and sit 6 out of an 8 hours.  Hence, claimant is able to perform a full range of sedentary work.  Claimant's obesity has been considered in conjunction with [her] other impairment(s) as  required by SSR 02-01p, but it does not further limit claimant's residual functional capacity.  Claimant has no other functional limitations.[72]

This assessment focuses entirely on plaintiff's physical limitations.  Addressing the VE, the ALJ

---

[68]*Id.* (*quoting* 61 Fed.Reg. 34474-01 (July 2, 1996)).

[69]*See* 20 C.F.R. S 404.1545(b); *see also Dunbar v. Barnhart*, 223 F. Supp. 2d 795, 802 (W. D. Tex.2002).

[70]*See  Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir.2001);  *Watson v. Barnhart*, 288 F.3d 212, 218 (5th Cir. 2002) (holding that the ALJ erred in failing to determine whether Watson was capable not only of obtaining employment, but also maintaining it) .

[71]*See* 20 C.F.R. § 404.1520a (dealing only with the evaluation of mental impairments).

[72]*See* ALJ Kuchulis's Decision [Adm. Rec. 19].

stated in addition to the foregoing that Brockmann had difficulty climbing stairs, ladders and scaffolds, but was able to perform simple repetitive work.[73]  Although the limitation described in the ALJ's final phrase-"able to perform simple repetitive work"-could be construed as an assessment of Brockmann's  mental limitations, the Court finds that the ALJ did not adequately consider plaintiff's mental impairments when assessing her RFC.

The regulations and the case law require the ALJ to directly compare the claimant's mental RFC with the mental demands of her previous work and make clear factual findings on that issue.[74]  Where, as here,  the ALJ finds that a mental impairment is "severe,"[75] the mental RFC must specifically describe how these impairments do not prevent the claimant from continuing her previous employment.[76]  Having failed to properly assess Brockmann's mental RFC, the VE (upon whom the ALJ relied)[77] was unable to properly compare plaintiff's capacity to the demands of her previous work.  Accordingly, this error requires remand with instructions to consider plaintiff's mental impairments when assessing her RFC.

The regulations also require that the ALJ consider the "type, dosage, effectiveness, and side effects of any medication" that the claimant takes or has taken to alleviate pain or other

---

[73]*See* Transcript of Hearing [Adm. Rec. 276].

[74]*See Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir.1994); *Morris v. Barnhart*, 2007 WL 496851 (W. D. Tex. 2007).

[75]*See* ALJ Kuchulis Findings at Item 3 [Adm. Rec. 20].

[76]*See Latham*, 36 F.3d at 484.

[77]*See* Decision of ALJ (noting that the impartial vocational expert testified that, based upon the claimant's residual functional capacity, she could return to her past relevant work) [Adm. Rec. 19].

symptoms."[78]   The ALJ's failure to consider or discuss the effect, if any, of continuing

prescription drug therapy (*i.e.*, Zoloft, Trazadone, Bextra, Vicoprofin, Neurontin, Valium,

Xanax, Zanaflex) on the plaintiff's employability constitutes  error.[79]

### Credibility

Considering the selective reading of the medical evidence, the ALJ may also need to

revisit his reasons for discounting the plaintiff's allegations regarding the severity of her pain

and other physical/mental limitations.  As a general rule, courts cede enormous latitude and

deference to the ALJ's credibility determinations.  The SSA regulations and  Fifth Circuit

precedent require objective medical evidence showing an underlying medical condition which

could produce the type of pain alleged.[80]   There is such evidence which is part of the

administrative record in the present case.

On the other hand, there is more than one suggestion in the plaintiff's mental health

records indicating some concern about "drug seeking behavior."[81]  This area should be fully

explored, particularly in light of Brockmann's May 3, 2006 GAF Score of 50.[82]

The Court notes that a GAF score represents a clinician's judgment of an individual's

---

[78] 20 C.F.R. S 404.1529(c)(3)(iv); *see also Crowley v. Apfel*, 197 F.3d 194 (5th Cir. 1999).

[79] *See Crowley*, 197 F.3d at 199.

[80] *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994) (noting that, as to a determination of whether the plaintiff's pain is disabling, the first consideration is whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to induce the pain alleged and that medical factors which indicate disabling pain include limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, etc.).

[81] *See* Notes 52-55 *supra*, and accompanying text.

[82] *See* Note 59, *supra*, and accompanying text.

overall level of functioning.[83] The reporting of overall functioning is done by using the GAF

Scale, which is divided into ten ranges of functioning- *e.g.*, 90 (absent or minimal symptoms) to

1 (persistent danger of severely hurting self or others, or unable to care for herself). The GAF

rating is within a particular decile if either the symptom severity or the level of functioning falls

within the range. Lower GAF scores signify more serious symptoms. A GAF rating of 50

indicates a "serious" impairment in social, occupational, or school functioning ( *e.g.*, no friends,

unable to keep a job); whereas, a GAF score of 53 indicates "moderate" symptoms ( *e.g.*, flat

affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,

occupational or school functioning ( *e.g.*, few friends, conflicts with peers or co-workers).[84]

### Hypothetical Question

There are two requirements for a hypothetical question posed to a VE.  First, it must

incorporate all disabilities recognized by the ALJ.[85]  Because in the present case the ALJ appears

to have made a determination of depression at step two, he was required to incorporate that

mental impairment into the hypothetical.  Second, the ALJ must give the claimant or his

representative the opportunity to correct any deficiencies in the question by suggesting defects.[86]

In the case at bar, the ALJ's  hypothetical question failed to incorporate Brockmann's

depression.[87]  Moreover, neither the plaintiff nor her non-attorney representative had an

---

[83] *See* American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 32 (4th ed.2000).

[84] *See id.* at 34.

[85] *Bowling*, 36 F.3d at 436.

[86] *See id.*

[87] *See* Transcript of Hearing [Adm. Rec. 276-77].

opportunity to correct the deficiency.[88]  After questioning the VE, the ALJ stated: "Ma'am, I

don't know if you have anything else to say.  I'm gonna issue a decision to you in the next few

weeks, you will get it in the mail."  Brockmann asked if the ALJ: "Do you need any other

documentation?"  Plaintiff's question went unanswered and the hearing was closed.[89]

The Court notes that Brockmann's representative was allowed to address the plaintiff and

posed three short questions concerning (1) the etiology of plaintiff's mental condition, (2)

whether there was a medical diagnosis of major depression and (3) whether there was any

documentation of that diagnosis in plaintiff's medical records.[90]  Brockmann insisted that there

was such a diagnosis.  In an exchange with the ALJ, plaintiff's representative explained that he

had just taken over Brockmann's case, "her records were all messed up," he had to go to the

clinic just prior to the hearing and that he was unable to find the diagnosis in the clinic progress

notes.[91]

<b>Additional Medical Evidence</b>

As previously mentioned, the diagnosis of recurrent major depression together with the

March, 2005 MRI/EMG diagnostic studies, *inter alia*, were submitted to the Appeals Council for

review.  Most notably, the regulations provide as follows:

> If new and material evidence is submitted, the Appeals Counsel shall consider the
> additional evidence only where it relates to the period on or before the date of the

---

[88]*See id..*

[89]*Id.* at 277.

[90]*Id.* at 273.

[91]*Id.* at 274.

[ALJ's] hearing decision.[92]

In this case, the additional evidence relates to the period on or before the ALJ's hearing decision and has a direct bearing on conditions which were determined to be "severe" at step two of the analysis.[93]  It cannot be discerned on this record whether the additional material evidence discussed above regarding plaintiff's spine and mental conditions were considered by the Appeals Council. Under the heading, "What We Considered," the Appeals Council's order merely states:

> In looking at your case, we considered *the reasons* you disagree with the decision. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.[94]

The Appeals Council did not state that it was making the additional evidence submitted post-decision part of the record in this case.  The Council did not specifically address the additional medical evidence or make any reference to it at all.  The Appeals Council simply denied plaintiff's request for review.

Upon examination of the evidence presented to the ALJ and Appeals Council that is part of the record, the Court finds that it is reasonable to conclude that this evidence could have changed the outcome.  The ALJ must be given the opportunity to specifically consider the comprehensive record, including the noted new evidence, on remand.

The Fifth Circuit has held that "an ALJ is required to consider each of the section 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating

---

[92]20 C.F.R. §404.970(a).

[93]*See* ALJ Kuchulis Determination at Item 3 [Adm. Rec. 20].

[94]*See* Notice of Appeals Council Action dated October 19, 2006 (which fails to mention that any additional evidence was submitted) (italicized emphasis added) [Adm. Rec. 5-7].

specialist."[95]  If an ALJ rejects the opinion of a treating physician, he must articulate specific

reasons for doing so.[96]  It is the policy of the Commissioner to "[g]enerally ... give more weight

to opinions from [the claimant's] treating sources, since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical

impairment."[97]  Further, the regulations require the ALJ to "give good reasons in [the] notice of

determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §

416.927(d)(2).

On remand, the ALJ must explicitly state whether or not he adopts the functionality

statements of the plaintiff's mental health treatment providers and include some discussion of the

significant history and the relevant results of all clinical testing with respect to the plaintiff's

spinal condition.   Neither the Appeals Council nor the ALJ mentioned moderate to severe

spinal canal stenosis, compression, contact with the nerve roots bilaterally, straightening of the

normal alignment of the cervical/lumbar spine or abnormal enhancement of the S1 and possibly

S2 nerve roots suggesting arachnoiditis vs. postoperative changes.[98]   Indeed, the ALJ concluded

that the "record fails to demonstrate the presence of *any* pathological clinical signs, significant

medical findings, or *any* neurological abnormalities which would establish the existence of a

disabling pattern of pain."[99]

---

[95]*Newton*, 209 F.3d at 456.

[96]*See Loza*, 219 F.3d at 395.

[97]20 C.F.R. § 416.927(d)(2).

[98]Adm. Rec. 217,220-224.

[99]Adm. Rec. 18-19 (italicized emphasis added).

## VI. CONCLUSION

For all of the forgoing reasons, it is this Court's opinion that the Commissioner's decision is not supported by evidence relevant and sufficient for a reasonable mind to accept as adequate support for the conclusion.  Given the omissions, it cannot be said that the facts of plaintiff's claim for a period of disability were fully and fairly developed.  The ALJ's decision failed to comport with the applicable legal standards, which require consideration of the omitted records in conjunction with the rest of the relevant medical evidence made part of plaintiff's case and a comparison of same with plaintiff's hearing testimony.[100]  A substantiality of evidence evaluation does not permit a selective reading of the medical evidence of record.    The RFC assessment must always consider and address *all* medical source opinions and contain a thorough discussion of the objective medical evidence, as well as discuss how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

The Court remains mindful that the Commissioner has the exclusive prerogative to weigh evidence and resolve conflicts and further acknowledges that judicial review is both highly deferential to the Commissioner and limited in scope. The Court does not purport to direct a particular ultimate outcome upon remand. Therefore, upon remand, the Commissioner will be free to re-examine all issues.

### RECOMMENDATION

Based upon the foregoing discussion of the issues, evidence and the law,  and because the ALJ committed legal error as explained above,

---

[100]20 C.F.R. § 416.927 & SSR 96-2p.

**IT IS RECOMMENDED** that the defendant's motion for summary judgment be DENIED, the Commissioner's decision be REVERSED and the case be REMANDED for further proceedings consistent with this report and findings.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within 10 days shall bar such party, except upon grounds of plain error or manifest injustice, from attacking on appeal the factual findings and legal conclusions adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir.1996) (*en banc*).

New Orleans, Louisiana, this <u>13th</u> day of December, 2007.


DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE